**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAMONT HAGAN,** | : | **CIVIL ACTION NO. 1:08-CV-1766** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRIS CHAMBERS**, et al., | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Damont Hagan ("Hagan"), a state inmate incarcerated at the State Correctional Institution at Camp Hill, Pennsylvania ("SCI-Camp Hill") at all times relevant, commenced this civil action on September 23, 2008.[1]  The matter is presently proceeding *via* a second amended complaint filed on June 11, 2009.  (Doc. 60).  Contained in the amended complaint are claims that during his confinement in the Special Management Unit ("SMU") at SCI-Camp Hill, defendants John Palakovich ("Palakovich"), Richard Southers ("Southers"), Chris Chambers ("Chambers"), Richard Via ("Via"), Nathan Goss ("Goss"), Keith Carberry ("Carberry"), Paul Bingaman ("Bingaman"), Barry Jones ("Jones"), Mark Spieles ("Spieles"), Thomas Bickert ("Bickert"), Robert Eger ("Eger"), Joe Gemberling ("Gemberling"), Matthew Troutman ("Troutman") and William Warner ("Warner") subjected Hagan to inhumane conditions of confinement in violation of the Eighth Amendment, retaliated against him for exercising his First Amendment rights, and

---

[1]Hagan has since been transferred to the State Correctional Institution at Pittsburgh.  (Doc. 74, Declaration of Chris Chambers, at 3, ¶ 11.)

conspired with one another in engaging in the aforementioned constitutional violations. Id. Ripe for disposition is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion will be granted.

## I.    Statement of Material Facts[2]

During the relevant time period, January 3, 2008, until November 30, 2008, Hagan was housed in the SMU at SCI-Camp Hill, a Commonwealth of Pennsylvania Department of Corrections ("DOC") program that manages inmates who are disruptive and/or violent. (Doc. 72, ¶¶ 7, 9; Doc. 83, ¶ 2.) The SMU Handbook, which is provided to all SMU inmates, informs the inmates of the general rules and regulations to be followed at all times. (Doc. 72, ¶ 10). Showers and exercise are offered during the 6:00 a.m. to 2:00 p.m. shift. (Doc. 72, ¶ 12.) Supplies are

---

[2]In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiff, who is the nonmoving party. See infra Part II. However, Hagan has failed to comply with Local Rule 56.1, which requires the nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement, and to "include references to the parts of the record that support the statements." L.R. 56.1. Hagan disregards this requirement by creating his own statement of material facts and not addressing the numbered paragraphs set forth in defendants' statement of material facts. (Compare Doc. 72 (defendants' Rule 56 statement), with Doc. 83 (Hagan's Rule 56 statement)). Therefore, with the exception of those facts clearly disputed by Hagan *and* supported by adequate record references, the court will adopt defendants' statement of facts. See L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."); see also Harrison v. Ammons, Civ. A. No. 1:05-CV-2323, 2009 WL 2588834, at *1 n.1 (M.D. Pa. Aug. 19, 2009) (Conner, J.) (adopting moving party's statement of facts when nonmovant failed to comply with Local Rule 56.1); United States ex rel. Paranich v. Sorgnard, 286 F. Supp. 2d 445, 447 n.3 (M.D. Pa. 2003) (Conner, J.) (same), aff'd, 396 F.3d 326, 330 & n.5 (3d Cir. 2005).

distributed during the 2:00 p.m. to 10:00 p.m. shift in accordance with the schedule set forth in the SMU Handbook. (Doc. 72, ¶ 13). That schedule provides that facial soap is issued once per week with the trade in of the residue bar required; toothpaste is issued once every fourteen days with a trade in of a spent tube required; a toothbrush and washcloth are issued once per month with a trade in of the worn items required; and cell cleaning equipment is issued once per week. (Doc. 72, ¶ 14, Doc. 83, ¶ 17.) Inmates are responsible for the cleanliness of their assigned cell. (Doc. 72, ¶ 15, Doc. 83, ¶ 3.) The handbook further specifies that the rules and regulations contained therein are not all inclusive and that orders that are not mentioned in the handbook are to be followed and failure to follow an order will result in disciplinary action in accordance with Administrative Directive DC-ADM 801. (Doc. 72, ¶ 11.)

Also, SMU staff documents positive or negative behavior on a "DC-17X Quarters Card" ("DC-17X") which is used for making recommendations regarding an inmate's continued placement in the SMU. (Doc. 72, ¶ 16.) Hagan's DC-17X is a part of the record. (Doc. 72, ¶ 20, Ex. A-1.) Hagan's DC-17X is replete with notations showing that when he did not receive a toiletry or hygiene material, he refused the item, was restricted from receiving the item due to disciplinary reasons (Exs. B-2, B-4, B-6, B-23, B-25, B-30, E-1, and G-2), was sleeping during distribution of supplies, or did not comply with the SMU Inmate Handbook provisions for receiving supplies. (Doc. 72, ¶ 231, Ex. A-1.)

**A.    Conditions of Confinement Claims**

    1.    <u>Hagan's allegations that he was deprived of all basic toiletries and hygiene materials on January 3-6, 2008, January 8, 2008, January 10-13, 2008, January 15, 2008, January 17-20, 2008, January 22, 2008, January 24-27, 2008, January 29, 2008, and January 31, 2009</u>

On January 3, 2008, Hagan refused exercise, but accepted a shave. (Doc. 72, ¶ 23.) On January 4, 2008, he received laundry exchange, but refused exercise. (Doc. 72, ¶ 24, Ex. A-1.) Later that day, he was placed on exercise, shower, shave, cell cleaning, and commissary restrictions after receiving Misconduct No. A635837 reported by defendant Spieles, for threatening an employee or their family with bodily harm; using abusive, obscene, or inappropriate language to an employee; and refusing to obey an order. (Doc. 72, ¶ 25, Ex. B.) He was found guilty of all charges on January 9, 2008. (<u>Id.</u>) No appeal was taken. (<u>Id.</u>)

On January 5, 2008, he refused a shower and it was noted that he was restricted from cleaning his cell. (Doc. 72, ¶ 26.) On January 6, 2008, he was restricted from shaving and was not standing on his door when toilet paper and soap were distributed in accordance with the SMU Inmate Handbook. (Doc. 72, ¶ 27.) On January 8, 2008, he refused a shower, and later that day, was again placed on exercise, shower, shave, cell cleaning, and commissary restrictions after receiving Misconduct No. A635838 reported by defendant Eger, for threatening an employee and using abusive language to an employee. (Doc. 72, ¶ 28, Ex. B-6; Doc. 72, ¶ 29, Ex. A-1.) He was found guilty at his January 9, 2008, disciplinary hearing.

(Doc. 72, ¶ 28, Ex. B-5.) His appeal of the finding of guilt determination was unsuccessful. (Id.)

On January 10, 2008, he refused the offer to exercise and although he accepted a shower, he refused soap and made obscene comments to staff. (Doc. 72, ¶30.) The following day he refused laundry exchange, and the day after that he refused a shower and was restricted from cell cleaning due to misconducts. (Id. at ¶¶ 31-32.) On January 13, 2008, he did not receive a shave because he was on shave restriction. (Id. at ¶ 33.) On January 15, 2008, Hagan refused exercise and a shower and did not receive a shave because it was still restricted. (Id. at ¶ 34) On January 17, 2008, he refused a shower and was restricted from shaving. (Id. at ¶ 35.) The following day he refused exercise, and on January 19, 2008, he refused a shower. (Id. at ¶ 36.) On January 20, 2008, he received soap and toilet paper. (Id. at ¶ 38.) On January 22, 2008, Hagan was restricted from shaving and refused exercise and a shower. (Id. at ¶ 39.)

On January 24, 2008, Hagan was restricted from shaving and refused a shower. (Id. at ¶ 40.) Also on January 24, 2008, Hagan received Misconduct No. A831720 for threatening an employee or their family with bodily harm; sexual harassment; indecent exposure; using abusive language to an employee; and refusing to obey an order. (Id. at ¶ 41.)

On January 25, 2008, Hagan was not at his door for laundry exchange. (Id. at ¶ 42.) On January 26, 2008, he refused a shower, and on January 27, 2008, he was restricted from shaving. (Id. at ¶ 43.) On January 27, 2008, Hagan received

Misconduct No. A635852 for threatening an employee; using abusive/obscene language; and refusing to obey an order.  (Id. at ¶ 44, Ex. B-9.)

On January 29, 2008, Hagan refused a shower and exercise, and he was restricted from shaving.  (Id. at ¶ 45, Ex. A-1.)  On January 31, 2008, Hagan was restricted from shaving.  (Id. at ¶ 46.)

    2.    Hagan's allegations that he was deprived of all basic toiletries and hygiene materials on February 1-3, 2008, February 5, 2008, February 7-10, 2008, February 12, 2008, February 14-17, 2008, February 19, 2008, and February 21-22, 2008

On February 1, 2008, he exchanged his laundry.  (Doc. 72, ¶ 47, Ex. A-1.)  He was not at his door for cell cleaning on February 2, 2008, but, the following day he received soap and toilet paper, and he accepted a shave.  (Id. at ¶¶ 48, 49, Ex. A-1.)  On February 5, 2008, and February 7, 2008, he refused a shower and offers to exercise, but accepted a shave; on February 7, 2008, he received soap.  (Id. at ¶¶ 50, 51, Ex. A-1.)  He accepted his laundry exchange the following day.  (Id. at ¶ 52, Ex. A-1.)  On February 9, 2008, Hagan refused a shower.  (Id. at ¶ 53, Ex. A-1.)  On February 10, 2008, he accepted a shave.  (Id. at ¶ 54, Ex. A-1.)  On February 12, 2008, he refused exercise and a shower, but accepted a shave.  (Id. at ¶ 55, Ex. A-1.)  On February 14, 2008, Hagan refused exercise and a shower and was restricted from shaving.  (Id. at ¶ 57, Ex. A-1.)  On February 15, 2008, he refused exercise and accepted the laundry exchange.  (Id. at ¶ 58, Ex. A-1.)  The following day, Hagan was on cell cleaning restriction and refused a shower. (Id. at ¶ 59, Ex. A-1.)  He refused a shave on February 17, 2008.  (Id. at ¶ 60, Ex. A-1.)  On February 19, 2008, Hagan

accepted a shower and was restricted from shaving. (Id. at ¶ 61, Ex. A-1.) On

February 21, 2008, Hagan refused exercise and a shower, accepted a shave, and was

issued soap. (Id. at ¶ 62, Ex. A-1.) He also refused exercise on February 22, 2008.

(Id. at ¶ 63, Ex. A-1.)

### 3. Hagan's allegations that he was deprived of all basic toiletries and hygiene materials on March 11, 2008, March 13-16, 2008, March 18, 2008, March 20-23, 2008, March 25, 2008, and March 27-30, 2008

On March 11, 2008, Hagan refused a shower and was restricted from shaving.

(Doc. 72, ¶ 64, Ex. A-1.) On March 13, 2008, Hagan refused exercise and a shower

and was restricted from shaving. (Doc. 72, ¶ 106, Ex. A-1.) He was verbally

assaultive during the soap exchange and no soap was given to him. (Id.) On March

14, 2008, he refused exercise and was yelling obscenities during laundry exchange.

(Id. at ¶ 107.) On March 15, 2008, Hagan refused a shower and was using abusive

language toward staff so no cell cleaning materials were distributed. (Id. at ¶ 108.)

The following day, he was restricted from shaving, and he was sleeping during the

soap and toilet paper exchange. (Id. at ¶ 109.) Two days after that, he refused

exercise and a shower and was restricted from shaving. (Id. at ¶ 110.) On March 20,

2008, Hagan refused exercise and a shower and was restricted from shaving. (Id. at

¶ 111.) On March 21, 2008, he was using racial slurs, yelling during laundry

exchange, and refused exercise. (Id. at ¶ 112.) On March 22, 2008, he accepted a

shower. (Id. at ¶ 113.) On March 23, 2008, Hagan was restricted from shaving and

did not hand in his soap during the soap exchange. (Id. at ¶ 114.) On March 25,

2008, Hagan accepted a shower, but was restricted from shaving. (Id. at ¶ 115.) He refused exercise, a shower, and a shave and soap on March 27, 2008. (Id. at ¶ 116.) The next day he refused exercise and accepted laundry. (Id. at ¶ 117.) The day after that, he accepted a shower. (Id. at ¶ 118). On March 30, 2008, Hagan refused soap and toilet paper, and he also refused a shave. (Id. at ¶ 119.)

4. <u>Hagan's allegations that he was deprived of all basic toiletries and hygiene materials on April, 1, 2008, April 3-6, 2008, April 8, 2008, April 10-12, 2008</u>

On April 1, 2008, he refused exercise and accepted a shower, but was restricted from shaving. (Id. at ¶ 120.) On April 2, 2008, Hagan received Misconduct Nos. A940210, A940211, A940212, for unauthorized use of the mail after he sent letters with attached affidavits *via* third parties to three inmates asking each inmate to have the enclosed affidavits notarized and thereafter, mail them to the address he provided in the letters. (Doc. 72, ¶¶ 121, 122, Exs. B-15 through B-17.) In one of the letters, he states that he "did all of this 'intentional.' I had to find a route to roll out so I 'created' a problem so I can go through the courts." (Doc. 72, ¶ 123, Ex. B-15.) He was found guilty of all three misconducts. (Doc. 72, ¶ 124, Exs. B-15 through B-17.) He did not appeal the misconducts. (Doc. 72, ¶ 126.) On April 3, 2008, Hagan refused soap, accepted exercise and a shower, and was restricted from shaving. (Doc. 72, ¶ 127, Ex. A-1.). The following day, he was  lying in his bed for laundry exchange and refused exercise. (Id. at ¶ 128.) The day after that, he refused cell cleaning, but accepted a shower. (Id. at ¶ 129.) The next day, he refused toilet paper and soap and was restricted from shaving. (Id. at ¶ 130.) On

April 8, 2008, and April 10, 2008, Hagan refused exercise and a shave, but accepted a shower. (Id. at ¶ 131.) He refused laundry exchange on April 11, 2008, but accepted exercise. (Id. at ¶ 132.) On April 12, 2008, he accepted a haircut. (Id. at ¶ 133.)

5. <u>Hagan's allegations that he was deprived of all basic toiletries and hygiene materials on June 1, 2008, June 3, 2008, June 5-8, 2008, June 10, 2008, June 12-15, 2008</u>

On June 1, 2008, he was restricted from shaves, and subsequently, on June 3, 2008, when he was given the opportunity to shave, he did not get out of bed. (Doc. 72, ¶ 139, Ex. A-1.) On June 5, 2008, he refused exercise and was sleeping for shaves and soap distribution. (Id. at ¶ 140.) The next day, Hagan refused exercise. (Id. at ¶ 141.) He received commissary, but he was verbally abusive and loud and therefore, he did not receive laundry exchange. (Id.) On June 7, 2008, he refused a shower. (Id. at ¶ 142.) On June 8, 2008 and June 10, 2008, he refused shaves. (Id. at ¶ 143.) On June 12, 2008, he refused exercise, a shower, and a shave, (Id. at ¶ 144.) On June 13, 2008, Hagan refused exercise. (Doc. 72, ¶ 147, Ex. A-1.) On June 14, 2008, he was verbally abusive when cell cleaning materials were distributed. (Id. at ¶ 148.) On June 15, 2008, Hagan was restricted from shaving and did not receive toilet paper and soap because he was vulgar during distribution. (Id. at ¶ 149.)

**B.    False Misconduct, Retaliation, and Conspiracy Claims**

1.    <u>January 3, 2008 through June 13, 2008</u>

Hagan alleges that Troutman, Eger, Spieles, Bickart, and Gemberling retaliated against him by depriving him of all hygiene materials from January 3, 2008, through June 13, 2008. (Doc. 60, at 2, ¶ 7.

He also alleges that Eger and Spieles urinated on his belongings on February 26, 2008. On February 26, 2008, he was escorted back to the SMU from a medical psychiatric observation cell ("POC") by defendants Troutman, Carberry, and Gemberling, and was placed in cell 02-19 on E-block. (Doc. 72, ¶ 65; Doc. 83 ¶ 20.) Hagan claims that when he returned from the POC he found all his property drenched in urine. (Doc. 60, ¶ 26.) He contends that Spieles and Eger urinated on his property in retaliation for his filing of grievances and complaints against them. (Doc. 60, ¶ 26, Doc. 83, ¶ 23.) Spieles and Eger declare that they did not did not urinate on his belongings. (Doc. 72, ¶ 67.) The record reflects that Hagan did not show defendants Carberry and Bingaman clothing, bedding or other property "drenched in urine." (Doc. 72, ¶ 66.)

Hagan's toothbrush, toothpaste, soap and toilet paper were not in his cell when he returned from POC. (Doc. 72, ¶ 69.) Carberry directed defendant Bingaman to replace the missing items. (Doc. 72, ¶ 70.) Hagan then began flooding the tier (Doc. 72, ¶ 71) and, as a result, defendant Carberry instructed defendant Bingaman to temporarily suspend Hagan's toothpaste, toothbrush, soap, and toilet paper supplies. (Doc. 72, ¶ 72.) He was subsequently provided with the hygiene items. (Id. at ¶ 73; Doc. 83, ¶ 33.)

He was given misconduct A740328 for refusing to obey an order and was placed on exercise, shower, shave, cell cleaning, and water restriction. (Doc. 72, ¶ 71, Ex. E; Doc. 83, ¶ 28.) Water restriction was in place for approximately four and one-half days, from midnight on February 26, 2008, until noon on March 3, 2008, but

he was offered water at regular increments for purposes of drinking and/or flushing the toilet in his cell. (Doc. 72, ¶ 81; Ex. E-2.) According to the water restriction report, he accepted water seven out of thirty-six times offered (Doc. 72, ¶ 81.) For instance, on February 26, 2008, the day the water restriction began Hagan refused a flush and/or drink of water at 2400 hours and 0400 hours. (Doc. 72, ¶ 82, Ex. E-2.) The next day, he accepted a flush and/or drink at 1600 and 0400 but refused both the remaining four times he was offered. (Id. at ¶ 83, Ex. E-2.) On February 28, 2008, he accepted a flush and/or drink of water at 0800 and 1200 hours, but refused it at 1600 and 2000 hours. (Id. at ¶ 84, Ex. E-2.) Additionally, he refused his soap exchange and was verbally abusive toward staff. (Doc. 72, ¶ 85, Ex. A-1.) On February 29, 2008, he refused a flush and/or drink of water all four times he was offered the service. (Doc. 72, ¶ 86, Ex. E-2.) On March 1, 2008, he accepted a drink of water and/or flush at 0800 hours and refused same at 1200, 1600, and 2000 hours. (Id. at ¶ 87.) On March 1, 2008, he received a new jumpsuit, whites, linens and a mattress. (Id. at ¶ 88, Ex. E-2.) On March 2, 2008, he accepted a drink of water and/or flush at 0800 hours, but refused it five other times. (Id. at ¶ 89, Ex. E-2.) He also refused a haircut and a shave and was threatening to throw feces on staff. (Doc. 72, ¶ 90, Ex. A-1.) On March 3, 2008, Hagan refused a flush and/or drink of water at 0800 hours and accepted a flush and/or a drink of water at 1200 hours, at which time the water restriction ended. (Id. at ¶ 91.)

Defendants Troutman, Bickert, Spieles, Eger, Bingaman, and Carberry vigorously dispute Hagan's claim that they conspired to leave him in "inhuman"

conditions, left him in inhumane conditions, or retaliated against him, during this time period. (Doc. 72, ¶¶ 92, 95, 97.) Via and Jones have no recollection of Hagan's expression of concern about his conditions of confinement on two different days in February 2008, and Chambers specifically denies allegations that he refused to help Hagan because he filed grievances and complaints. (Doc. 72, ¶ 98.) Goss states that Hagan never informed him of inhumane conditions. (Id.)

Conversely, inmate Jackson states that Hagan was left in his cell during this time period without a drink of water or flush of the toilet and "given nothing dispite [sic] him addressing staff continuously about his condition, physical discomfort and mental deterioration." (Doc. 83, ¶ 32; Doc. 84-4, Jackson Decl., at 45-46, ¶ 3; Doc. 84-8, Jackson Decl., at 4, ¶ 7.) Inmate Gary Tucker states that he "witnessed all SMU staff refuse to give Hagan a drink of water or a flush (toilet), despite Hagan requesting such daily." (Doc. 83, ¶ 32; Doc. 84-3, Declaration of Gary Tucker ("Tucker Decl."), at 52 ¶ 4.) Inmate Terry Brooks states that he "witnessed correctional officers Bickert, Troutman, Spieles, Eger, Weis, and Gemberling . . . deprive inmate Damont Hagan of toiletries, 'frequently' dispite [sic] Hagan informing them of skin irritation, rashes and other things but these staff's [sic] replied with comments such as 'Hagan, you're not getting shit" or 'just write it up again pussy,' or 'when you quit snitching on us, we'll start giving you your shit.' Mr Hagan, also addressed superiors such as Chris Chambers, Lt. Goss, Lt. Via, and the Superintendent, but Hagan still received nothing and was even threatend [sic] by Lt. Goss and Chris Chambers." (Doc. 83, ¶ 32; Doc. 84-4, Declaration of Terry

Brooks ("Brooks Decl."), at 48, ¶ 2.) Hagan alleges that as a result of the conditions to which he was exposed, he suffered bleeding rashes. (Doc. 72, ¶ 100; Doc. 83, ¶ 45.) He concedes that he was treated for the rashes. (Id.)

He contends that the misconduct that was issued was fabricated and written in retaliation for him filing complaints and grievances. (Doc. 60, ¶¶ 16, 26.) The DOC operates a disciplinary process that provides clear notice of prohibited behavior, outlines a fair hearing process, and establishes consistent sanctions for violations of DOC rules and regulations provided in the DC-ADM 801. (Doc. 72, ¶ 77.) DC-ADM 801 provides a process for resolution of alleged inmate violations; the initial misconduct is heard by a Hearing Examiner, if the violation is determined to need formal resolution, an appeal from the Hearing Examiner's decision can be made to the Program Review Committee ("PRC"), within fifteen days of the hearing; an appeal from the PRC decision to the Superintendent, within seven days of the PRC decision; and the final appeal to the Chief Hearing Examiner, within seven days of the decision of the Superintendent. (Doc. 72, ¶ 78.) Hagan refused to attend the hearing and he was found guilty. (Doc. 72, ¶ 76.) He did not appeal the misconduct to the PRC. (Id. at ¶ 79.) Because he failed to appeal the misconduct to final review, he failed to exhaust his administrative remedies. (Id. at ¶ 80.)

On March 10, 2008, seven extra photos were found and confiscated during a cell search. (Doc. 72, ¶ 102.) Hagan alleges that, following this cell search, he did not receive soap or a toothbrush until March 20, 2008. (Doc. 60, ¶ 4.) However, on March 12, 2008, Hagan was placed on exercise, shower, shave, and cell cleaning

restrictions following receipt of Misconduct No. A740333 for threatening an employee or other family with bodily harm, using abusive, obscene, or inappropriate language to an employee, and refusing to obey an order. (Doc. 72, ¶ 105, Ex. B-14.) Thereafter, on March 13, 2008, he was verbally abusive during soap exchange and no soap was given; on March 16, 2008, Hagan was sleeping during soap exchange; on March 23, 2008, Hagan did not hand in his soap during soap exchange in accordance with the SMU Inmate Handbook; on March 27, 2008, Hagan refused soap; on March 30, 2008, Hagan refused soap; on April 3, 2008, Hagan refused soap; and on April 6, 2008, Hagan refused soap. (Doc. 72, ¶ 104, Ex. A-1.)

     2.    <u>May 31, 2008 through August 1, 2008</u>

On May 30, 2008, Hagan received Misconduct No. A831732 for sexual harassment and using abusive, obscene, or inappropriate language to an employee. (Doc. 72, ¶ 134; Ex. B-18.) On May 31, 2008, he received Misconduct No. A730107 for refusing to obey an order. (Doc. 72, ¶ 135; Ex. B-19.) Hagan filed a grievance charging that defendant Warner used excessive force on him on May 31, 2008. (Doc. 83, ¶ 31; Doc. 76, at 94.) In response to his grievance, he was informed that ". . . you're [sic] claim that you were physically assaulted on 5-31-08 by Sgt. Warner was videotaped, having reviewed this video tape several times it is clear from my observation that you were not assaulted by Sgt. Warner." (Doc. 76, at 96.) This conclusion was upheld on appeal. (Doc. 76, at 98, 102.) He alleges that because of this grievance, Warner retaliated against him by refusing to turn off the bright light

in his cell from May 31, 2008, through August 1, 2008.  (Doc. 60, ¶ 44.)  To the extent that Hagan's light remained on during nighttime hours, it is undisputed that Hagan was verbally abusive, obscene or vulgar when he requested that the light be turned off.  (Doc. 72, ¶ 137.)

On June 17, 2008, defendant Troutman was running the control bubble and was informed by defendant Warner, who was cleaning up the flood from another inmate with defendant Gemberling, that Hagan was flooding the tier and was refusing to obey orders to stop flooding.  (Doc. 72, ¶ 150.)  According to Inmate David Crews, it was his cell toilet that caused the flood on this date.  (Doc. 84-3, at 50.)  He contends that Hagan was not flooding; rather, defendant Warner dumped buckets of contaminated water near Hagan's cell and shouted that Hagan was flooding the tier.  (Id.)

Defendant Troutman issued misconduct A730117 to Hagan for threatening an employee with bodily harm, using abusive, obscene or inappropriate language to an employee, and refusing to obey an order based on the following:  "On the above date and time while officer was running the control bubble, Sgt Warner informed this officer that inmate Hagan (D5 9488) became verbally abusive and started to flood the tier.  Sgt Warner shut off inmate Hagan's water.  Inmate Hagan continued to shout profanities shouting 'Crack this door you cracker and I'll come out and f_ _ _ you up.'  Inmate Hagan refused all orders given by Sgt. Warner to stop flooding the tier."  (Doc. 72, ¶ 151, Ex. E-3.)  Because he did not appeal this

misconduct to final review, he failed to exhaust available administrative remedies. (Doc. 72, ¶ 160.)

Hagan filed grievance number 233862 on June 21, 2008, complaining that the above described misconduct was fabricated in that the toilet of another inmate overflowed with "urine infested water" and in the course of cleaning it up, defendants Warner and Gemberling pushed the water under his door, thereby contaminating his cell and subjecting him to inhumane conditions. (Doc. 77, at 73-74.) The DOC's Policy entitled "Inmate Grievance System," the DC-ADM 804 ("804"), provides a multi-step administrative grievance appeal process that was established to ensure that inmates have an avenue through which to resolve issues relating to their incarceration. (Doc. 72, ¶ 162.) The grievance policy is contained in the Inmate Handbook, and therefore inmates are placed on notice of requirements they must meet in grieving their issues. (Id. at ¶ 167.) The first step in the inmate grievance process for all issues is initial review. (Id. at ¶ 163.) After initial review, the inmate "may appeal an Initial Review decision, or grievance restriction, to the Facility Manager, also known as the Superintendent, in writing, within ten working days from the date of the Initial Review decision or notice of a grievance restriction." (Id. at ¶¶ 164, 165.) Upon completion of the initial review and the appeal to the Superintendent, "Any inmate who is dissatisfied with the disposition of an appeal from the Facility Manager may submit an appeal to the Secretary's Office of Inmate grievances and Appeals within 15 working days from the date of the Facility Manager's/designee decision." (Id. at ¶ 166.)

Hagan's grievance was dismissed on July 11, 2008, based on the fact that he refers to a June 16, 2008, flood on his block, but there was no record of a flood or incident on that date. (Doc. 72, ¶¶ 161, 168.) He appealed to the Superintendent who informed him that despite his subsequent clarification of the date of the incident in his appeal, it was his responsibility to provide correct information during the initial grievance process and the response to his grievance was correct. (Id. at ¶ 169.) Therefore, his appeal was denied. (Id.) He then filed a letter on August 12, 2008, explaining that he would need time to obtain additional documents in support of his appeal. (Doc. 84-2, at 6.) His letter was filed "without action" because the Secretary's Office of Inmate Grievances & Appeals found no prior record of an appeal on the issue. (Doc. 72, ¶ 170.) Subsequently, he submitted information in support of his appeal, but the appeal was dismissed as untimely. (Id. at ¶ 171.) He failed to properly exhaust the issues contained in this grievance. (Id. at ¶ 172.)

Hagan alleges that from the date he was issued the misconduct, June 17, 2008, through June 23, 2008, his cell smelled like urine, he was not provided with the means to clean his cell, and was never offered one flush of his toilet or given use of his water. (Doc. 60, ¶ 34.) He submits the declarations of other SMU inmates who declare that he was denied any flush of his toilet and water. (Doc. 84-3, Tucker Decl., at 52 ¶ 5; Doc. 84-3, Declaration of David Crews ("Crews Decl."), at 57, ¶ 3; Doc. 84-4, Jackson Decl., at 46, ¶ 4.)

As a result of the misconduct, Hagan was placed on exercise, shower, shave, cell cleaning, and water restrictions. (Doc. 72, ¶ 152, Doc. 83, ¶ 56.) Because of the water restriction, his cell water was turned off and he was offered water at 4-hour increments for purposes of drinking and/or flushing the toilet in his cell. (Doc. 72, ¶ 174.) However, on June 17, 2008, he refused a flush and/or a drink of water all three (3) times he was offered same. (Id. at ¶ 175.) On June 18, 2008, Hagan refused a flush and/or a drink of water at 0800, 1600, and 2000 hours, but he accepted a flush and/or a drink of water at 1200 hours. (Id. at ¶ 176.) On that same date, he was given soap and toilet paper. (Id. at ¶ 177, Ex. A-1.) The following day, he refused a flush and/or drink of water at 1600, 2000, and 2400 hours and accepted a flush and/or a drink of water at 0800, 1200, and 0400 hours. (Doc. 72, ¶ 179, Ex. E-4.) Also, on June 19, 2008, Hagan refused soap. On June 20, 2008, Hagan refused a flush and/or a drink of water at 0800, 1600, 2000, 2400, and 0400 hours and accepted a flush and/or a drink of water at 1200 hours. (Doc. 72, ¶ 180.) He also refused exercise on June 20, 2008. (Id. at ¶ 181.) On June 21, 2008, Hagan refused a flush and/or a drink of water at 0800, 1200, and 1600 hours and accepted a flush and/or a drink of water at 2000 hours. (Id. at ¶ 182.) On June 21, 2008, he refused cell cleaning and a shower. (Id. at¶ 183.) On June 22, 2008, Hagan refused a flush and/or a drink of water at 1600 and 2000 hours and accepted a flush and/or a drink of water at 0800 and 1200 hours. (Id. at¶ 184.) On June 22, 2008, he did not receive toilet paper or soap because he was vulgar during distribution. (Id. at¶ 185.) On June 23, 2008, he refused a flush and/or a drink of water at 1600, 2000, 2400, and

0400 hours and accepted a flush and/or a drink of water at 0800 and 1200 hours.  (Id. at ¶ 186.)  On June 24, 2008, Hagan refused a shower and exercise and was on shave restriction.  (Id. at ¶ 187.)

The misconduct hearing for flooding the tier was held on June 24, 2008. (Doc. 76, at 65.)  Hagan refused to enter a plea and attend the hearing.  (Id.)  He was found guilty in absentia and sanctioned with ninety days of disciplinary custody. (Id.)  He contends that this was a fabricated misconduct written by defendant Troutman at the direction of defendant Warner (Doc. 60, ¶ 45), but he did not pursue an appeal of the misconduct.  (Doc. 75 at 38, ¶ 60.)

Hagan also received numerous misconducts during the months of July, August, September, and November.  (Doc. 72, ¶¶ 191-201.)

### 3.  November 23, 2008 through November 30, 2008

On November 23, 2008, Hagan was issued misconduct A831774 by defendant Warner for threatening an employee or their family with bodily harm based on the following:  "On above date & time while supervising the clean up from a previous inmate caused flood, inmate Hagan D59488 stated to this Sgt. and CO1 Gemberling, 'I'll show you a real flood bitch then you'll have to get me out and I'll f _ _ _ your old ass up, your gonna get yours bitch.'  At this time water was observed coming out from under cell D1-09.  Inmate Hagan 059488 continued to yell [and] threaten this officer."  (Doc. 72, ¶¶ 202-204, Ex. G-1; Doc. 83, ¶¶ 68, 70.)

As a result of the misconduct, he was placed on exercise, shower, shave, cell cleaning, and water restrictions.  (Doc. 72, ¶ 205, Ex. G-2; Doc. 83, ¶ 71.)  Hagan

submitted the declaration of a fellow inmate who states that "Hagan received no drink of water or a flush of toilet from 11-23-08 through 11-30-08 dispite [sic] him requesting such." (Doc. 83, ¶ 80, Doc. 84 at 58, ¶ 7). Conversely, the water restriction report indicates that during the period of November 23, 2008 and November 29, 2008, Hagan was offered the opportunity for a drink of water and a flush of his toilet every four hours. (Doc. 72, ¶ 206, Ex. G-3.) On November 23, 2008, when the period of water restriction began, Hagan refused a drink of water and/or a flush of his toilet at 2000 and 2400 hours. (Id. at ¶ 207.) On that date, he received soap and toilet paper. (Doc. 72, ¶ 213, Ex. A-1.) On November 24, 2008, he was not standing at his door for laundry exchange. (Id. at ¶ 214.) On November 24, 2008, and November 25, 2008, he refused a drink of water and a flush of his toilet every time it was offered. (Id. at ¶¶ 208-09.) On November 26, 2008, he refused a drink of water and a flush of his toilet five of the six times they were offered. (Id. at ¶ 210.) From November 27, 2008, through November 29, 2008, he refused a drink of water and a flush of his toilet all sixteen times the service was offered. (Id. at ¶ 211.) On November 27, 2008, he refused a shower. (Id. at ¶ 215.) On November 28, 2008, he received laundry exchange. (Id. at ¶ 216.) On November 29, 2008, he refused a shower and was restricted from cell cleaning. (Id. at ¶ 217.)

Hagan voluntarily waived attendance at the hearing on the misconduct and was found guilty in absentia. (Doc. 72, ¶ 218.) The finding of guilt was vacated on appeal and the matter was remanded to the hearing examiner because the hearing was originally scheduled on less than twenty-four hours notice of the misconduct.

(Id. at ¶¶ 219-20.)  Hagan also voluntarily waived the disciplinary hearing on remand.  (Id. at ¶221.)  The hearing examiner found him guilty of the charge.  (Id. at ¶ 222.)  Because Hagan failed to appeal this misconduct fo final review, he failed to exhaust the available administrative procedures.  (Id. at ¶ 223.)

Defendants Chambers and Palakovich did not conspire to "keep [Hagan] under inhuman conditions from November 23, 2008 through November 30, 2008" and "from having reliable trustworthy evidence in this civil action, and acted in furtherance by destroying the security tape."  (Doc. 72, ¶ 224.)  Hagan has not produced any factual evidence of the existence of an agreement between Defendants Chambers and Palakovich to deprive him of his civil rights.  (Id. at ¶ 225.)  Hagan has failed to allege that Defendant Warner conspired with another individual in the manner violative of 42 U.S.C. 1985(2).  (Id. at ¶ 229.)

Hagan was transferred to the State Correctional Institution at Pittsburgh on January 28, 2009.  (Doc. 72, at ¶ 9.)

## II.    <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence

must be adequate, as a matter of law, to sustain a judgment in favor of the

non-moving party on the claims. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242,

250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

587-89 (1986); <u>see also</u> Fed. R. Civ. P. 56(c), (e).  Only if this threshold is met may the

cause of action proceed.  <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III. <u>Discussion</u>

### A. **Eighth Amendment**

#### 1. <u>Conditions of Confinement</u>

"The Cruel and Unusual Punishments Clause of the Eighth Amendment

proscribes 'punishments which are incompatible with the evolving standards of

decency that mark the progress of a maturing society.'" <u>Tillman v. Lebanon Cnty.</u>

<u>Corr. Facility</u>, 221 F.3d 410, 417 (3d Cir. 2000) (footnote omitted) (quoting <u>Estelle v.</u>

<u>Gamble</u>, 429 U.S. 97, 102 (1976)).  In order to establish an Eighth Amendment claim,

a plaintiff must first prove "a sufficiently serious objective deprivation."  <u>Tillman</u>,

221 F.3d at 418.  This objective component is narrowly defined.  "[C]onditions that

cannot be said to be cruel and unusual under contemporary standards are not

unconstitutional.  To the extent that such conditions are restrictive and even harsh,

they are part of the penalty that criminal offenders pay for their offenses against

society." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981).  The Eighth Amendment

does not mandate that prisons be free of discomfort.  <u>Hudson v. McMillian</u>, 503 U.S.

1, 9 (1992).  Only "extreme deprivations" are sufficient to make out an Eighth

Amendment claim.  <u>Id.</u>  A prisoner must show that the condition, either alone or in

combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes, 452 U.S. at 347). These needs include "food, clothing, shelter, sanitation, medical care and personal safety." Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997).

An Eighth Amendment violation occurs when the prison official is deliberately indifferent to inmate health or safety and when this act or omission results in the denial of "the minimal civilized measure of life's necessities." See Farmer, 511 U.S. at 832 (1994). Therefore, a prison official can be held liable under the Eighth Amendment for denying humane conditions of confinement if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See id. at 847. Claims of negligence, without a more culpable state of mind, do not constitute "deliberate indifference." See Singletary v. Pennsylvania Dep't of Corr., 266 F.3d 186, 193 n. 2 (3d Cir. 2001).

a.    *Exhaustion*

Hagan claims that he had no means to clean his cell and was without water and a flush of his toilet from June 17, 2008 through June 24, 2008. Defendants first seek judgment on this claim based on Hagan's failure to exhaust his grievance through the administrative process with respect to the time period of June 17, 2008, through June 24, 2008. The Prison Litigation Reform Act (PLRA) requires prisoners to present their claims through an administrative grievance process before seeking redress in federal court. The act specifically provides as follow:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a). Prisoners must exhaust administrative remedies as to any claim that arises in the prison setting, regardless of any limitations on the kind of relief that may be gained through the grievance process. See Porter v. Nussle, 534 U.S. 516, 532 (2002); Booth v. Churner, 532 U.S. 731, 741 n. 6 (2001). "[I]t is beyond the power . . . of any . . . [court] to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (quoting Beeson v. Fishkill Corr. Facility, 28 F. Supp. 2d 884, 894-95 (S.D.N.Y. 1998) (citing Weinberger v. Salfi, 422 U.S. 749, 766 (1975)). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." Nyhuis, 204 F.3d at 71. The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Id. at 93 (quoting Nussle, 534 U.S. at 525)).

The DOC's Policy entitled "Inmate Grievance System," the DC-ADM 804 ("804"), provides a multi-step administrative grievance appeal process that was established to ensure that inmates have an avenue through which to resolve issues relating to their incarceration. (Doc. 72, ¶ 162.) The first step in the inmate grievance process for all issues, except those already governed by other specific procedures, is initial review. (Id. at ¶ 163.) After initial review, the inmate "may appeal an Initial Review decision, or grievance restriction, to the Facility Manager, also known as the Superintendent, in writing, within ten working days from the date of the Initial Review decision or notice of a grievance restriction." (Id. at ¶¶ 164, 165.) Upon completion of the initial review and the appeal to the Superintendent, "Any inmate who is dissatisfied with the disposition of an appeal from the Facility Manager may submit an appeal to the Secretary's Office of Inmate grievances and Appeals within 15 working days from the date of the Facility Manager's/designee decision." (Id. at ¶ 166.)

Hagan's grievance was dismissed because he put the wrong incident date on his grievance form and the grievance coordinator could not verify that the incident took place. However, rather than resubmit the grievance at the initial level with the correct information, Hagan chose to pursue an appeal arguing that he supplied the wrong date to the grievance coordinator but that his grievance had merit. He appealed to the Superintendent who informed him that, despite the fact that he clarified the date of the incident in his appeal, it was his responsibility to provide correct information during the grievance process, he failed to do so at the initial

level of review and therefore, the dismissal of the grievance was correct. (Doc. 72, ¶ 169.) Therefore, his appeal was denied. (Id.) He filed an appeal to the Secretary's Office of Inmate Grievances & Appeals which found no prior record of an appeal on the issue because Hagan had not submitted a proper request for an extension of time in accordance with DC-ADM 804(D)(1)(c). ( Id. at ¶ 170; Doc. 86, Declaration of Tracy Williams ("Williams Decl."), at 21, ¶ 12.) Nowhere in a letter submitted by Hagan does he "specifically request an extension of time in accordance with the DC-ADM 804(D)(1)(c) to file an appeal of the July 23, 2008 decision by Deputy Superintendent for Facilities Management Southers, in which he denied Inmate Hagan's appeal of the July 11, 2008 initial review response." (Doc. 86, Williams Decl., at 22, ¶ 15.) Consequently he was sent a "File Without Action" notice. (Doc. 72, ¶ 170.) He submitted the information several months later and the appeal was dismissed as untimely. (Id. at ¶ 171.) "Inmate Hagan did not comply with the procedural requirements of the DC-ADM 804 with regard to the appeal of Grievance No. 233862, and therefore, he did not exhaust his administrative remedies with regard to this grievance." (Doc. 86, Williams Decl., at 23, ¶ 23.) Hagan failed to properly exhaust the administrative remedy process with respect to this time period.

Even if he had exhausted, his claim would still be subject to dismissal as discussed below.

b.     *Merits*

Generally, Hagan alleges that he was deprived of toiletries and hygiene materials on numerous dates spanning the time period of January 3, 2008, through June 15, 2008.  He specifically alleges that he was denied basic hygiene items, including water and flushes of his toilet from February 26, 2008, through March 3, 2008, that he was confined to his cell from June 17, 2008 until June 23, 2008, without the means to clean it and without water and the ability to flush his toilet.  He also alleges that he was confined to his cell without water from November 23, 2008 through November 30, 2008.  (Doc. 60, at 6, ¶ 52.)   He alleges that he lacked the means to clean his cell and was denied a flush of his toilet from November 23, 2008, to November 30, 2008 by defendants Jones, Chambers, Goss, and Via.  (Id. at ¶¶ 52, 56-60.)  Hagan alleges that Carberry took these actions "despite him knowing of my conditions and knowing that I had rashes and was sick."  (Doc. 60, at 3, ¶ 15.)

Lengthy deprivation of personal hygiene items may constitute a constitutional violation, depending, obviously, upon the extent of the violation and the nature of the items withheld.  For instance, continued deprivation of soap and a toothbrush may rise to the level of a constitutional violation.  See McCray v. Burrell, 516 F.2d 357, 367 (4th Cir. 1975) (considering soap and a toothbrush as "essential articles of hygiene").  In determining whether a prisoner has suffered a deprivation, courts may consider the length of time that the prisoner was without the items.  Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982) (citing Hutto v. Finney, 437 U.S. 678, 685 (1978))(finding that "[i]n considering whether a prisoner has been deprived

of his rights, courts may consider the length of time that the prisoner must go without these benefits. The longer the prisoner is without such benefits, the closer it becomes to being an unwarranted infliction of pain."); see also Castro v. Chesney, No. 97-4983, 1998 WL 767467, at *6 (E.D. Pa. Nov.3, 1998) (quoting Hutto, 437 U.S. at 685).

The court finds that the temporary deprivations of the items at issue, were not sufficiently serious to rise to the level of a constitutional violation. See Matthews v. Murphy, 956 F.2d 275 (Table) (9th Cir. 1992) (finding no Eighth Amendment violation where inmate was deprived of towel, toothbrush, toothpaste, and soap for thirty-four days); Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (holding no constitutional violation where inmate not given soap, toothpaste, or toothbrush for ten days); Castro v. Chesney, No. 97-4983, 1998 WL 767467 (E.D. Pa. Nov. 3, 1998) (finding that the deprivation of towels, soap, a toothbrush or toothpaste for two-day period was not sufficiently serious to rise to the level of a constitutional violation); Dumas v. Pennsylvania Dep't of Corr., No. 07-142, 2007 WL 1276908 (W.D. Pa. Apr. 30, 2007) (concluding no constitutional violation where plaintiff alleges he was in filthy conditions for only three weeks).

In addition, the cell conditions to which Hagan was exposed were temporary in nature, and, although unpleasant, were not sufficient to constitute a constitutional violation. See Rhodes, 452 U.S. at 347; see also Wheeler v. Walker, 303 Fed. App'x (7th Cir. 2008) (rejecting Eighth Amendment claim where prisoner alleged that during two week period he had only a thin blanket to protect him from

28

frigid air entering his unheated cell through window with broken latches, roaches crawled over him while he tried to sleep on a torn mattress, urine and waste "encrusted" sink and toilet, trash, dirt, and debris-covered floors, walls, and sink, and stench of waste came from broken toilet); Davis v. Scott, 157 F.3d 1003, 1004 (5th Cir. 1998) (finding that three-day placement in cell with blood on walls and excrement on floors did not meet Eighth Amendment's objective component); Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996) (concluding that a four-day period of confinement in a cell with overflowing toilet causing stench of feces and urine did not constitute an Eighth Amendment violation); Whitnack v. Douglas Cnty, 16 F.3d 954, 958 (8th Cir. 1994) (stating that intolerable conditions lasting twenty-four hours did not constitute Eighth Amendment violation); Schaeffer v. Schamp, No. 06-1516, 2008 WL 2553474, at *6 (W.D. Pa. June 25, 2008) (determining that placement in a cell for ten days without mattress, soap, toilet paper, running water, legal supplies, prescription medication, and food other than one meal a day was insufficient to state an Eighth Amendment claim); Wilson v. Schomig, 863 F. Supp. 789, 794-95 (N.D. Ill. 1994) (ruling that absent showing of physical harm, fact that inmate slept on urine and feces-stained mattress in dirty, roach-infested, leaky cell did not state an Eighth Amendment claim).

Conditions must be far more extreme than those detailed by Hagan. See, e.g. McKeithan v. Beard, 322 Fed. App'x. 194, 202 (3d Cir. 2009) (finding objective component of Eighth Amendment claim met where plaintiff was housed next to psychotic inmates who smeared themselves with feces and stood at their cell doors,

placed feces in air vents, flooded tier with waste, and banged endlessly on sinks) (citing <u>Vinning-El v. Long</u>, 482 F.3d 923, 925 (7th Cir. 2007) (recognizing claim where plaintiff described floor covered with water, a broken toilet, feces and blood smeared on the wall, and no mattress); and <u>McBride v. Deer</u>, 240 F.3d 1287, 1292 (10th Cir. 2001) (upholding Eighth Amendment claim where inmate was forced to remain in feces-covered cell for three days)); <u>DeSpain v. Uphoff</u>, 264 F.3d 965 (10th Cir. 2001) (finding violation of Eighth Amendment where, for thirty-six hours, water overflow after riot flooded unit to standing depth of four inches, prisoners urinated into the water in which feces and uneaten food floated, water was nearly even with bottom of food carts, toilets would not flush, and inmate was afraid to eat); <u>McCord v. Maggio</u>, 927 F.2d 844, 848 (5th Cir. 1991) (finding Eighth Amendment violation where prisoner was forced to live and sleep for two years in unlit cell with sewage back up and roach infestation); <u>Fruit v. Norris</u>, 905 F.2d 1147, 1151 (8th Cir. 1990) (forcing inmates to work in a shower of human excrement without protective clothing and equipment violated Eighth Amendment).

In this case, Hagan's "deprivations" were either the result of his refusal to accept the item when offered or an appropriate, temporary restriction in response to Hagan's admitted misconduct. Consequently, defendants motion for summary judgment will be granted on the Eighth Amendment claims.

## 2.    False Misconduct

Hagan alleges that three false misconduct reports were filed against him: (1) A740328, refusing to obey an order to stop flooding the tier on February 26, 2008 (Doc. 76, at 58-60); (2) A730117, threatening an employee or their family with bodily harm, using abuse, obscene or inappropriate language to an employee, and refusing to obey an order (Doc. 76, at 62-65), and (3) A831774, threatening an employee or their family with bodily harm (Doc. 76, at 92.).  A false misconduct charge, standing alone, does not qualify as an Eighth Amendment violation.  Booth v. Pence, 354 F. Supp.2d 553, 558-59 (E.D. Pa. 2005) (citing Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir.1997)).  Similarly, the filing of false disciplinary charges does not constitute a claim under § 1983 when the inmate receives a due process hearing and is given the opportunity to rebut charges.  Smith v. Mensinger, 293 F.3d 641, 653-54 (3d Cir. 2002); see also Freeman v. Rideout, 808 F.2d 949, 952-53 (2d Cir. 1986).  Here, Hagan does not allege that he was denied a hearing or an opportunity to present a defense.  In fact, he voluntarily waived his attendance at two of the misconduct hearings, A740328 and A831774,  and refused to enter a plea at the hearing on misconduct A730117.  Accordingly, defendants are entitled to an entry of summary judgment on Hagan's claims of fabricated misconduct reports.

**B.     First Amendment**

The First Amendment offers protection for a wide variety of expressive activities.  <u>See</u> U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities may infringe upon an individual's rights under the First Amendment.  <u>See</u> <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  <u>Rauser v. Horn</u>, 241 F.3d 330 (3d Cir. 2001) (quoting <u>Allah</u>, 229 F.3d at 225).  The last <u>Rauser</u> prong requires a prisoner to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him.  The court employs a burden-shifting regime to determine whether a causal link exists.  The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him.  <u>See</u> <u>id.</u> (citing <u>Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)).  The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity.  <u>See</u> <u>id.</u>  If defendants prove that they would have made the same decision

absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. See id. at 334.

> Hagan sets forth the following First Amendment retaliation claims:
>
> Troutman, Eger, Spieles, Bickert, and Gemberling, deprived Hagan of all hygiene materials from January 3, 2008 through June 13, 2008 because Hagan filed grievances and request slips against them. (Doc. 60, at 2, ¶ 7.)
>
> Eger and Spieles retaliated against him for filing complaints and grievances against him by urinating on his property on February 26, 2008. (Doc. 60, at 5, ¶ 26.)
>
> Warner flooded Hagan's cell on June 17, 2008, and refused to turn his cell light off from May 31, 2008 through August 1, 2008, because Hagan filed a grievance against him. (Doc. 60, at 4, ¶¶ 44, 47.)
>
> Warner, Gemberling, Jones, Chambers, Via, Goss, Southers, and Palakovich retaliated against him for testifying in a civil action, filing grievances and filing a civil rights action by "leaving and subjecting [him] to inhuman conditions from November 23, 2008 through November 30, 2008." (Doc. 60, at 7, ¶ 67.)

In sum, Hagan alleges that he was retaliated against for filing complaints and grievances, testifying in a civil action, and filing this civil action. The filing of a grievance or a lawsuit clearly falls within the ambit of the First Amendment. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); see also Allah, 229 F.3d at 224 (noting that it is well settled that "prisoners have a constitutional right to access to the courts"); Peterkin v. Jeffes, 855 F.2d 1021, 1036 (3d Cir. 1988); Cook v. Boyd, 881 F. Supp. 171, 176, n. 4 (E.D. Pa. 1995). Defendants assume, for purposes of this motion, that Hagan was engaging in protected activity. (Doc. 71, at 19.)

<u>January 3, 2008 through June 13, 2008</u>

When the record establishes that an inmate has engaged in protected conduct, the inmate must then demonstrate that he has suffered some adverse action at the hands of prison officials.  <u>See</u> <u>Rauser</u>, 241 F.3d at 333 (citing <u>Allah</u>, 229 F.3d at 225).  Hagan alleges that Troutman, Eger, Spieles, Bickart, and Gemberling, retaliated against him by depriving him of all hygiene materials from January 3, 2008 through June 13, 2008 (Doc. 60, at 2, ¶ 7), and that Eger and Spieles urinated on his belongings on February 26, 2008 (Doc. 60, at 4, ¶ 26).

The court previously addressed this allegation in the context of the Eighth Amendment, but it will reiterate certain record facts for the sake of clarity.  Hagan's version of the events is contradicted by the DC-17X records which are documented contemporaneously with the events.  From these records, the court is able to determine when Hagan received hygiene items and when he was offered privileges. The court is further able to discern that Hagan refused numerous offers for a shower, refused all offers to exercise, rarely took advantage of offers of soap and toilet paper, and refused most opportunities for laundry.  (Doc. 74, at 12-60.)  With respect to cell cleaning, Hagan either refused or was denied the privilege due to misconduct.  (<u>Id.</u>)  On several occasions, Hagan "was not on the gate," per the SMU rules and procedure, to receive hygiene materials, take advantage of cell cleaning or shower privileges.  In addition, he repeatedly shouted vulgarities, made verbally abusive comments, and acted in a threatening and/or sexually inappropriate manner.  (<u>Id.</u>)

Although Hagan argues that DC-17X records are fabricated, this position has no support in the record. These bare assertions and conclusory allegations cannot withstand summary judgment. See Podobnik v. U.S. Postal Service, 409 F.3d 584, 594 (3d Cir. 2005); see also FED. R. CIV. P. 56(e)(2) (opponent of summary judgment must "set out specific facts showing a genuine issue for trial").

His claim that Eger and Spieles urinated on his belongings on February 26, 2008, is plagued with the same problems. Spieles and Eger declare that they did no such thing. (Doc. 72, ¶ 67.) Bingaman and Carberry did not observe any contents of the new cell "drenched" in urine, and Hagan did not show them clothing or bedding "drenched" in urine. (Doc. 72, ¶ 66.) During the grievance appeal process, it was concluded that there was simply no evidence to support the claim that his clothing and bedding were covered in urine. (Doc. 84-10.)

The statement of inmate Jackson, that "he heard through the vent these officers [Spieles and Eger] saying '[Hagan's] going to be mad as shit about this white man's piss'," without any corroboration, does not create a factual issue for trial. (Doc. 84-8, Jackson Decl., at 3, ¶¶ 4 5). That Hagan also reported the incident to the Human Rights Coalition FedUp! Chapter is also insufficient to establish a factual issue. The record lacks any reliable support for Hagan's allegations and is devoid of corroborative evidence for his conclusory allegations. In the absence of any reasonable proof of this claim, summary disposition is warranted.

"[W]here the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita, 475

U.S. at 587.  As a corollary of this principle from <u>Matsushita</u>, while it is generally true that on summary judgment motions a court should not resolve credibility issues, nevertheless, where the evidence adduced by a party is so incredible that reasonable minds could not believe it, the court is not barred from entering summary judgment based on such a record.  <u>Kreimar v. Bureau of Police for Town of Morristown,</u> 958 F.2d 1242, 1250 (3d Cir. 1992) ("[w]hile summary judgment may be based upon affidavits, conflicts of credibility should not be resolved on a hearing on the motion for summary judgment unless the opponent's evidence is 'too incredible to be believed by reasonable minds.' ") (quoting <u>Losch v. Borough of Parkesburg, Pa.</u>, 736 F.2d 903, 909 (3d Cir. 1984)).  In light of the summary judgment record, no reasonable jury could find for Hagan on these retaliation claims.

   2. <u>May 31, 2008 through August 1, 2008</u>

  Hagan also claims that he suffered adverse action at the hands of defendant Warner when Warner flooded his cell on June 17, 2008, and refused to turn his cell light off from May 31, 2008 through August 1, 2008.  (Doc. 60, at 4, ¶¶ 44, 47.)

  On June 17, 2008, the date Warner allegedly flooded his cell, Hagan was issued misconduct A730117 for threatening an employee with bodily harm, using abusive, obscene or inappropriate language, and refusing to obey an order based on the fact that he became verbally abusive and started to flood the tier and refused to obey Warner's order to stop flooding the tier.  (Doc. 72, ¶ 151.)  He refused to enter a plea and refused to attend the misconduct hearing.  He was found guilty in absentia.  (Doc. 72, ¶ 158.)

In accordance with DOC Administrative Directive 801, an inmate who has been found guilty on a misconduct charge may, within fifteen days of the hearing, file an appeal to the Program Review Committee ("PRC"). Within seven days of the PRC's decision, the inmate may file a second level appeal to the Superintendent. Finally, the inmate has one last avenue of appeal to the Chief Hearing Examiner. Hagan did not take advantage of the appeal process. An inmate is required to partake in this process prior to challenging any aspect of the misconduct in federal court. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford, 548 U.S. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Id. at 93 (quoting Nussle, 534 U.S. at 525)). Hagan did not pursue an appeal of the misconduct. (Doc. 72, ¶ 159.) Further, as noted in the Eighth Amendment discussion *supra*, he failed to exhaust the administrative claim process with respect to his claim that the misconduct was fabricated. He is therefore precluded from relying on the June 17, 2008 flooding of his cell to constitute adverse action.

Nor does the light issue constitute adverse action as there is no indication that this action was sufficient to deter him from exercising his constitutional rights. See Rauser, 241 F.3d at 333 (citing Allah, 229 F.3d at 225.) Subsequent to this time

period, he filed a multitude of grievances, pursued this civil action and testified on behalf of another inmate in his civil action.

Assuming *arguendo* that the cell light constituted adverse action, Hagan would still not prevail on this claim. The third element of a First Amendment claim requires plaintiff to show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred. Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table) (7th Cir. 1995). It is plaintiff's burden to prove that defendants were motivated by retaliation. Hannon v. Speck, 1988 WL 131367, at *4 (E.D. Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a substantial burden in attempting to prove that the actual motivating factor . . . was as he alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table). Hagan fails to set forth any such events. Moreover, Warner declares that the only time a cell light remains on at night is when the inmate becomes verbally abusive, obscene or vulgar. (Doc. 76, at 79, ¶ 15.) Based upon the record before the court, Hagan has failed to meet his burden with respect to this claim.

3.    November 23, 2008 through November 30, 2008

Hagan contends that defendants Warner, Gemberling, Jones, Chamber, Via, Southers, Palakovich and Goss retaliated against him "for testifying in a civil action, filing grievances or filing a 1983 civil action by leaving and subjecting me to

inhuman conditions from November 23, 2008 through November 30, 2008." (Doc. 60, at 7, ¶ 67.) Although he meets the "protected conduct" element of retaliation, he fails on the adverse action prong. As fully discussed in the Eighth Amendment section *supra*, Hagan was not subjected to inhumane conditions during this time period. It is also clear that the exposure to these conditions was the result of the issuance of misconduct A831774 based upon him threatening an employee with bodily harm and flooding the tier; not as the result of some retaliatory motive.[3] See Carter v. McGrady, 292 F.3d 152, 158 (3d. Cir. 2002) (finding viable retaliation claim not stated where a preponderance of the evidence shows that defendants would have taken the same action for reasons reasonably related to penological interest).

---

[3] The court recognizes that allegations of false charges based on retaliatory motives generally satisfies the requirement of "adverse" action sufficient to constitute constitutionally cognizable infringements. See Smith, 293 F.3d at 653 (finding that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment). However, in accordance with DOC Administrative Directive 801, an inmate who has been found guilty on a misconduct charge may take advantage of the appeal process. Hagan initially appealed the misconduct and the matter was remanded by the PRC to the hearing examiner because the hearing was scheduled less than twenty-four hours from the time of notice. (Doc. 75, Andrade Decl., at 44, ¶ 99.) He refused to attend the re-hearing (Doc. 76, at 90) and was found guilty of the charge. (Id. at 91.) He did not appeal this finding to the PRC. (Doc. 75, Andrade Decl., at 45, ¶ 102.)

C.    <u>Conspiracy</u>

In order to set forth a cognizable conspiracy claim, a plaintiff cannot rely on broad or conclusory allegations.  <u>D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.</u>, 972 F.2d 1364, 1377 (3d Cir. 1992); <u>Rose v. Bartle</u>, 871 F.2d 331, 366 (3d Cir. 1989); <u>Durre v. Dempsey</u>, 869 F.2d 543, 545 (10th Cir. 1989).  The Third Circuit has noted that a civil rights conspiracy claim is sufficiently alleged if the complaint details the following: (1) the conduct that violated the plaintiff's rights, (2) the time and the place of the conduct, and (3) the identity of the officials responsible for the conduct.  <u>Oatess v. Sobolevitch</u>, 914 F.2d 428, 432 n.8 (3d Cir. 1990). <u>See</u> <u>also</u>, <u>Colburn v. Upper Darby Twp.</u>, 838 F.2d 663 (3d Cir. 1988).

The essence of a conspiracy is an agreement or concerted action between individuals.  <u>See</u> <u>D.R. by L.R.</u>, 972 F.2d at 1377; <u>Durre</u>, 869 F.2d at 545.  A plaintiff must therefore allege with particularity and present material facts which show that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right.  <u>See</u> <u>id.</u>; <u>Rose</u>, 871 F.2d at 366.  Where a civil rights conspiracy is alleged, there must be specific facts in the complaint which tend to show a meeting of the minds and some type of concerted activity.  <u>Deck v. Leftridge</u>, 771 F.2d 1168, 1170 (8th Cir. 1985).  A plaintiff cannot rely on subjective suspicions and unsupported speculation.  <u>Young v. Kann</u>, 926 F.2d 1396, 1405 n. 16 (3d Cir. 1991).

Hagan sets forth three separate conspiracy claims.[4]  He first alleges that defendants Troutman, Eger, Spieles, Bickart and Gemberling conspired to deprive him of all toiletries and hygiene materials from January 3, 2008, through March 4, 2008.  (Doc. 60, at 2, ¶ 6.)  In his second claim, he avers that defendants Carberry, Bingaman, Eger, Bickart, Spieles and Troutman conspired to leave him under inhumane conditions from February 26, 2008 through March 4, 2008.  (Id. at 4, ¶ 25.)  He alleges in the third claim that defendants Chambers and Palakovich conspired to keep him under "inhuman conditions from November 23, 2008 through November 30, 2008; and from having reliable trustworthy evidence in this civil action, and acted in furtherance by destroying the security tape."  (Id. at 7, ¶ 67.)  His allegations in each of the three claims are conclusory, and do not meet the requirement that a civil rights conspiracy claim contain specific facts that tend to show a meeting of the minds and concerted activity.  More importantly, for the reasons set forth at length in this memorandum, the record is devoid of any reasonable evidence that a viable conspiracy or agreement existed other than an agreement to provide all basic needs to Inmate Hagan in a timely fashion in a manner consistent with penological interests.

---

[4]Plaintiff alleged a fourth conspiracy claim in his amended complaint at paragraph 46, but indicates in his opposition brief that he will not be pursuing this claim as it is fully covered in his retaliation claim.  (Doc. 82, at 8.)

D.     42 U.S.C. § 1985(2) Conspiracy

"42 U.S.C. § 1985(2) provides a cause of action against persons who conspire to obstruct justice." Messa v. Allstate Ins. Co., 897 F. Supp. 876, 881 (E.D. Pa. 1995). The first clause of § 1985(2) addresses the obstruction of justice in federal court, see Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988), and the second clause deals with conspiracies to deny individuals of equal protection of the laws. See Brawer v. Horowitz, 535 F.2d 830, 840 (3d Cir. 1976). Hagan simply alleges that "[d]efendant Warner violated this statute by retaliating on me for testifying on him in a civil action, by leaving me and putting me under inhuman conditions from November 23, 2008 through November 30, 2008." (Doc. 60, at 7, ¶ 68.) In this case, there is no evidence of a conspiracy, let alone a conspiracy for the purpose of impeding or obstructing justice. Defendants are also entitled to an entry of judgment on this claim.

IV.    **Conclusion**

Based on the foregoing, defendants' motion for summary judgment will be granted and judgment will be entered in favor of defendants and against Hagan. An appropriate order follows.

                                         S/ Christopher C. Conner
                                         CHRISTOPHER C. CONNER
                                         United States District Judge


Dated:        November 19, 2010

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAMONT HAGAN,** | : | **CIVIL ACTION NO. 1:08-CV-1766** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRIS CHAMBERS**, et al., | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this 19th day of November, 2010, it is hereby ORDERED that:

1.  Defendants' motion for summary judgment (Doc. 70) is GRANTED.

2.  The Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

3.  Plaintiff's motion for the court to take judicial notice (Doc. 89) is DENIED.

4.  The Clerk of Court is further directed to CLOSE this case.

5.  Any appeal from this order is DEEMED frivolous and not in good faith. <u>See</u> 28 U.S.C. § 1915(a)(3).

       <u>S/ Christopher C. Conner</u>
       CHRISTOPHER C. CONNER
       United States District Judge